UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

|  |  |
|---|---|
| ROSE M. HEMBROOK, | |
| Plaintiff, | Case No. 2:20-cv-00058 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| DONALD SEIBER, | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

This civil rights action brought under 42 U.S.C. § 1983 arises from two traffic stops and the resulting arrests of pro se Plaintiff Rose Hembrook that took place on September 27, 2019, and March 6, 2020. (Doc. No. 9.) Hembrook alleges that the officer who conducted both traffic stops, Defendant Tennessee Highway Patrol Trooper Donald Seiber, did not have probable cause for either arrest. (*Id.*) Hembrook brings this action against Seiber in his individual capacity for false arrest and malicious prosecution in violation of the Fourth Amendment to the United States Constitution. (*Id.*)

Seiber has moved for summary judgment on all of Hembrook's claims against him. (Doc. No. 29.) Hembrook has not filed a response in opposition to Seiber's motion for summary judgment. Considering the record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the motion for summary judgment be granted.

# I.   Background

## A.   Factual Background[1]

### 1.   The September 27, 2019 Traffic Stop and Arrest

Hembrook and her son, Chris Hembrook, operate an industrial hemp farm that is licensed under the name "Country Fried Pies."[2] (Doc. Nos. 9-1, 29-5, 31.) Hembrook operates a certified kitchen that is also called "Country Fried Pies." (Doc. Nos. 29-5, 31.) On September 27, 2019, Seiber was traveling east on State Route 30 (SR 30) in Bledsoe County, Tennessee, when he saw Hembrook's green Honda CRV stopped at the intersection of State Route 101 (SR 101) and SR 30. (Doc. Nos. 29-4, 31.) Seiber observed that Hembrook was not wearing her seatbelt. (Doc. Nos. 29-4, 31.) When Hembrook passed him a second time without her seatbelt on, Seiber initiated a traffic stop. (Doc. Nos. 29-4, 29-6, 31.) Seiber testified in his deposition that, when he approached Hembrook's vehicle, he smelled "a very strong odor of marijuana coming from the car"; he also noticed that Hembrook was sweating profusely and that her black shirt was covered in what Seiber described as "marijuana residue." (Doc. No. 29-4, PageID# 247; Doc. No. 31.)

Hembrook was "in a complete panic" and asked Seiber why he had stopped her. (Doc. No. 29-4, PageID# 248.) Seiber explained the reason for the stop and asked Hembrook where she was going, to which Hembrook responded that she was "'going to the dump.'" (Doc. No. 29-4, PageID# 249; Doc. Nos. 29-5, 31.) At Seiber's request, Hembrook exited her vehicle, and Seiber

---

[1]   The facts in this section are drawn from Seiber's statement of undisputed material facts (Doc. No. 31), summary judgment exhibits (Doc. Nos. 29–1–29-8), and the exhibits attached to Hembrook's amended complaint (Doc. Nos. 9-1–9-5).

[2]   Industrial hemp and marijuana are both produced from the plant *Cannabis sativa* L. Eric Walker, Univ. of Tenn. Inst. of Agric., *Status of Industrial Hemp in Tennessee* 2–3 (2018), https://www.tn.gov/content/dam/tn/agriculture/documents/planthealth/StatusOfIndustrialHempin TN_102218_W777.pdf.

asked her again where she was going. (Doc. No. 29-4.) Hembrook responded that she was "'going to the farmer's market.'"[3] (*Id.* at PageID# 250; Doc. No. 31.) Seiber told Hembrook that he could smell marijuana in her car and asked how much marijuana she had in the vehicle. (Doc. Nos. 29-4, 29-5, 31.) Hembrook denied that she had marijuana in her vehicle. (Doc. Nos. 29-4, 29-5.)

Hembrook consented to a search of her vehicle, and Seiber called for another unit to assist with the search. (Doc. Nos. 29-4, 29-5, 31.) Lieutenant Thomas Watson of the Bledsoe County Sheriff's Office was dispatched to the scene, arriving at approximately 5:10 p.m. (Doc. No. 29-4, 29-6, 31.) Watson smelled what he believed to be marijuana as he approached Hembrook's vehicle. (Doc. No. 29-6, 31.) Seiber and Watson searched the vehicle and found two trash bags containing approximately nine pounds of cannabis plants. (Doc. Nos. 9-4, 29-3–29-6, 31.) Seiber testified that, based on his training and experience, he believed the plants to be marijuana. (Doc. Nos. 29-4, 31.) Watson agreed that the plants "appeared to be marijuana." (Doc. No. 29-6, PageID# 315; Doc. No. 31.)

---

[3]     Hembrook has not filed a response to Seiber's statement of material facts, which states that "[w]hen asked . . . about her destination, [Hembrook] said: 'I'm going to the farmer's market'" (Doc. No. 31, PageID# 363, ¶ 11.) Therefore, under this Court's Local Rule 56.01(f), the Court deems it to be undisputed that Hembrook told Seiber she was going to the farmer's market. M.D. Tenn. R. 56.01(f) (failure to respond). In support of this statement of fact, Seiber cites his own deposition testimony that Hembrook told him she was going to the farmer's market. (Doc. No. 29-4, PageID# 250.) The portion of Hembrook's deposition transcript that has been filed in the record shows that Hembrook testified that she told Seiber that she was going to the dump. (Doc. No. 29-5.) It does not contain any testimony that she denied telling Seiber that she was going to the farmer's market. (*Id.*) This equivocal testimony regarding what Hembrook told Seiber is insufficient to create a genuine issue of material fact. *See Leonard v. Hoover*, 76 F. App'x 55, 57 (6th Cir. 2003) (finding no genuine issue of material fact where plaintiff "did not deny" making certain statements); *Smith v. LVNV Funding, LLC*, No. 2:11-CV-356, 2014 WL 4441195, at *1 n.1 (E.D. Tenn. Sept. 9, 2014) (noting that "testimony that the plaintiff does not remember" whether an event took place "does not amount to [a] sufficient denial[ ] to create a genuine issue of material fact').

Hembrook told Seiber that she had paperwork regarding the contents of the trash bags. (Doc. Nos. 29-4, 29-5.) In her deposition, Hembrook testified that she had gotten a stack of paperwork from her son, but "didn't really . . . look at it" and handed the papers to Seiber "without . . . examining them [her]self[.]" (Doc. No. 29-5, PageID# 286–87.) Seiber also searched the car for paperwork "for a good 40 to 45 minutes" (Doc. No. 29-6, PageID# 319) and located "what appear[ed] to be a hemp movement permit form . . ." (Doc. No. 29-4, PageID# 256). The hemp movement permit provided for the transport of one flat of hemp from 107 Green House Lane in Pall Mall, Tennessee, to Country Fried Pies in Pikeville, Tennessee, on September 25, 2019, in a silver vehicle. (Doc. Nos. 29-1, 29-3, 29-4, 29-6.) The date on the form appeared to have "been whited out and altered" in "blue ink pen[.]" (Doc. No. 29-4, PageID# 256; Doc. Nos. 29-1, 29-3, 29-6.) Seiber found a bag in the car containing white-out, a blue ink pen, and a small container that held a yellow, waxy substance that smelled like marijuana and that Seiber believed was "consistent with dab", a marijuana extract. (Doc. No. 29-4, PageID# 256; Doc. Nos. 9-4, 29-3.) Seiber also located a bakery permit issued by the Tennessee Department of Agriculture to Christopher J. Hembrook and Country Fried Pie. (Doc. Nos. 29-3, 29-4, 31.) That permit did not mention hemp. (Doc. Nos. 29-3, 29-4, 31.) Hembrook did not produce any certificate of analysis or other paperwork to support her argument that the plants were not marijuana. (Doc. Nos. 29-4– 29-6, 31.)

Hembrook told the officers several times that she was taking the plants to the dump (Doc. Nos. 29-4–29-6, 31), but Watson testified that the location of the traffic stop caused him to question whether that was true because, if Hembrook had been coming from the address of Country Fried Pies, she would have already passed the landfill and recycle center by the time she reached the location of the traffic stop, and the next closest trash dump would have been around twenty or

thirty miles away. (Doc. Nos. 29-6, 31.) Watson also testified that the location listed on the hemp movement permit in Pall Mall, Tennessee, was not a known trash dump. (Doc. No. 29-6.)

Seiber used his computer to research the law related to hemp, but could not locate anything on the Tennessee Department of Agriculture's website or in the Tennessee Code "that was going to be pertinent during [the] traffic stop." (Doc. No. 29-4, PageID# 260; Doc. No. 31.) He then called his on-duty sergeant and explained the circumstances of the traffic stop. (Doc. Nos. 29-4, 31.) The sergeant stated that he had never "come across anybody transporting hemp or dealt with hemp in any way." (Doc. No. 29-4, PageID# 262.) Seiber returned to speak with Hembrook and asked her about the possibility of going to the harvest site to get more information about the cannabis plants. (Doc. Nos. 29-4, 31.) Hembrook stated that she had laboratory analysis forms on her computer "showing that it was hemp[,]" but that "'there will be a shoot-out'" if Seiber went to the harvest site. (Doc. No. 29-4, PageID# 263; Doc. No. 31.)

Seiber again sought his sergeant's opinion. (Doc. No. 29-4.) The sergeant told him, "It sounds like you got nine pounds of marijuana that she's tempted to go out here and sell illegal." (Doc. No. 29-4, PageID# 266; Doc. No. 31.) Seiber agreed and, around an hour after he first pulled Hembrook over, he arrested her for possession of marijuana with the intent to manufacture, deliver, or sell in violation of Tennessee Code Annotated § 39-17-417. (Doc. Nos. 9-4, 29-4–29-6.) Hembrook was transported to the Bledsoe County Jail. (Doc. No. 9-4.)

According to the affidavit of Denise Woods, the Hemp Program Coordinator for the Tennessee Department of Agriculture, the only hemp movement permit obtained by Chris Hembrook for September 27, 2019, was created at 9:20 p.m., about three hours after Hembrook was booked into the jail. (Doc. Nos. 9-4, 29-2, 31.) The Department of Agriculture's records do

not reflect that any hemp movement permit was issued to Chris Hembrook for September 25, 2019, the date listed on the permit Hembrook produced during the traffic stop. (Doc. Nos. 29-2, 31.)

The charges against Hembrook were "dismissed on July 10, 2020, after an analysis from the Tennessee Bureau of Investigation confirmed that the substance seized from [Hembrook's] vehicle was in fact hemp." (Doc. No. 31, PageID# 369, ¶ 43; Doc. No. 9-5.)

### 2.     The March 6, 2020 Traffic Stop and Arrest

On March 6, 2020, Seiber was running radar on SR 30 West when he observed a driver, whom he later determined to be Hembrook, traveling forty-seven miles per hour in a thirty-mile-per-hour zone without wearing a seatbelt. (Doc. Nos. 29-4, 31.) Seiber pulled out behind the vehicle and turned on his lights to initiate a traffic stop, but Hembrook kept driving past "several pull-offs, several roads[,]" and "apartment complexes." (Doc. No. 29-4, PageID# 271; Doc. No. 31.) Hembrook finally pulled into the parking lot of Mag's Auto, a shop owned by Marsha and Jeremy Gould, stopped the car in front of the open garage doors where the Goulds were working, and entered the garage. (Doc. Nos. 29-4, 29-5, 29-7, 29-8, 31.) Marsha Gould testified that Hembrook drove into the parking lot "pretty fast[,]" "jumped out[,] and ran in the shop" while calling for help. (Doc. No. 29-8, PageID# 329–30.) Jeremy Gould testified that Hembrook "came speeding real fast and . . . just jumped out and was just yelling crazy. . . . [Y]ou really couldn't understand what she was yelling about, but . . . everybody could have heard her. She was really, really loud." (Doc. No. 29-7, PageID# 323.)

Seiber pulled in seconds behind Hembrook, approached the garage, and told Hembrook that he was pulling her over for a seatbelt violation. (Doc. Nos. 29-7, 29-8, 31.) The Goulds testified that Seiber tried to get Hembrook to return to her car and "deescalate the situation" (Doc. No. 29-7, PageID# 324; Doc. No. 29-8), but she "very loudly refused" to follow any of the police officer's orders[,]" "got pretty belligerent[,] and . . . caus[ed] a huge scene." (Doc. No. 29-8,

6

PageID# 330), and "just wouldn't cooperate" "the whole entire time" (Doc. No. 29-7, PageID# 324). This caused people in neighboring houses to come outside (Doc. No. 29-5) and disrupted the Goulds' business (Doc. Nos. 29-5, 29-7, 29-8). Hembrook stated in her deposition that she screamed for around "30, 40 minutes at the top of [her] lungs[.]" (Doc. No. 29-5, PageID# 295; Doc. No. 31.)

Seiber told Hembrook several times that she would be arrested for disorderly conduct if she did not stop yelling, but she "continue[d] to yell and scream." (Doc. No. 29-4, PageID# 272.) Eventually, he "grab[bed] ahold of her arm to try to escort her outside" and "she just locked up" and refused to walk. (Doc. No. 29-4, PageID# 274; Doc. No. 29-8.) Seiber made Hembrook put her hands behind her back and arrested her. (Doc. No. 29-4, PageID# 275; Doc. No. 31.) Hembrook eventually walked out of the garage to Seiber's car, where he searched her, but she refused to get into Seiber's car and continued to yell. (Doc. No. 29-4, 31.) Seiber waited for other officers to arrive at the scene. (Doc. Nos. 29-4, 31.) When Chief Holland from the Bledsoe County Sheriff's Office arrived and told Hembrook to get into the car, she stopped screaming and complied. (Doc. Nos. 29-4, 29-5, 29-8, 31.)

Hembrook was transported to the Bledsoe County Jail and charged with resisting arrest, disorderly conduct, and evading arrest. (Doc. Nos. 9-4, 31.) Those charges were dismissed on July 10, 2020. (Doc. Nos. 9-4, 31.)

### B.  Procedural Background

Hembrook, represented by counsel, initiated this action on September 17, 2020, by filing a complaint under 42 U.S.C. § 1983 for false arrest and malicious prosecution in violation of the Fourth Amendment to the United States Constitution. (Doc. Nos. 1–1-6.) Hembrook later filed an amended complaint. (Doc. Nos. 9–9-5.) She seeks a declaratory judgment, compensatory and punitive damages, and costs and fees. (Doc. No. 9.) The Court entered an agreed case management

order stating that dispositive motions were to be filed by March 9, 2022, responses were due within twenty-eight days after the filing of the motion, and optional replies were to be filed fourteen days later. (Doc. No. 17.)

On February 1, 2022, Hembrook's counsel moved to withdraw as her attorneys of record. (Doc. Nos. 25, 25-1.) The Court granted counsel's motion to withdraw and ordered Hembrook to file a notice by March 9, 2022, stating "whether she intends to retain new counsel or represent herself going forward in this action." (Doc. No. 27.) Hembrook did not file a notice as directed by the Court and, on March 15, 2022, the Court ordered her to show cause "why the Magistrate Judge should not recommend that this action be dismissed under Rule 41(b) for [her] failure to prosecute her claims." (Doc. No. 33, PageID# 377.) The Court ordered Hembrook to file a notice addressing her representation status and intent to continue to prosecute this action by April 14, 2022. (Doc. No. 33.) That deadline was extended to April 21, 2022, after Hembrook called the Court to update her address and request a copy of the docket sheet and forms for filing a new civil action. (Doc. No. 34.)

On April 13, 2022, the Court received an unsigned filing from Hembrook that is identified as a "Pro Se" "Pleading" and consists of twenty-two typed pages, many of which are duplicates, and two pages that appear to be taken from the Court's form complaint for pro se litigants. (Doc. No. 36.) The Court "construe[d] this filing as a proposed second amended complaint" but found that Hembrook had not complied with the requirements for amending pleadings under the Federal Rules of Civil Procedure or this Court's Local Rules. (Doc. No. 37, PageID# 430.) The Court "reminded [Hembrook] of her obligation to respond to the Court's order to show cause (Doc. No. 33) by April 21, 2022, by filing a signed notice addressing her representation status and her plans to continue to prosecute this action." (*Id.* at PageID# 432.)

On April 21, 2022, Hembrook refiled a signed copy of her "Pro Se" "Pleading[.]" (Doc. No. 38.) It is not clear what purpose Hembrook intended that filing to serve. The document includes pages from the pro se complaint forms used by the Court, but cannot amend Hembrook's complaint for the reasons identified in the Court's April 15, 2022 order. (Doc. No. 37.) The document also states that Hembrook appears "[p]ro [s]e" (Doc. No. 38, PageID# 433) and includes arguments why Hembrook's "[c]ase [s]hould [b]e [h]eard" (Doc. No. 38-1, PageID# 450). For those reasons, and because it was filed on the deadline for Hembrook to respond to the show-cause order, the Court liberally construes Docket Entry 38 as Hembrook's response to that order (Doc. No. 33), and finds that Hembrook has demonstrated an intent to continue pro se in this action.

On March 9, 2022, Seiber filed a motion for summary judgment, memorandum of law, statement of undisputed material facts, and exhibits. (Doc. Nos. 29–31.) Seiber argues that he is entitled to summary judgment on Hembrook's false arrest and malicious prosecution claims because Hembrook cannot establish that Seiber lacked probable cause to arrest her and cannot make the evidentiary showing necessary to support her punitive damages claim. (Doc. No. 30.) Seiber also argues that he is entitled to qualified immunity from Hembrook's claims. (*Id.*) The Court ordered Hembrook to file any response in opposition to the motion within twenty-eight days and warned her "that failure to respond to the motion for summary judgment in accordance with the Federal Rules of Civil Procedure and this Court's Local Rules may result in the motion being granted as unopposed or the action being dismissed for failure to prosecute." (Doc. No. 32.) Hembrook has not responded to the motion for summary judgment.

## II.     Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial

burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

III.     **Analysis**

A.     **Local Rule 56.01 and Seiber's Initial Burden Under Federal Rule of Civil Procedure 56**

This Court's Local Rule 56.01 provides that "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Each of these facts "must be set forth in a separate, numbered paragraph[,]" "must be supported by specific citation to the record[,]" and "the word 'response' must be inserted and a blank space provided that is reasonably calculated to allow the non-moving party sufficient space to respond to the assertion that the fact is undisputed." *Id.* Parties opposing a motion for summary judgment must respond to each asserted fact by "(1) Agreeing that the fact is undisputed; (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." M.D. Tenn. R. 56.01(c) (response to statement of facts). "If a timely response to a moving party's statement of material facts . . . is not filed within the time periods provided by [the Local Rules], the asserted facts shall be deemed undisputed for purposes of summary judgment." M.D. Tenn. R. 56.01(f) (failure to respond).

Pro se parties are not excused from this requirement. *See* M.D. Tenn. R. 56.01(b)–(c). Indeed, the scheduling order in this action is clear that "the provisions of Local Rule 56.01 shall govern" motions for summary judgment filed in this action. (Doc. No. 17, PageID# 185.) The Court also warned Hembrook "that failure to respond to the motion for summary judgment in

accordance with the Federal Rules of Civil Procedure and this Court's Local Rules may result in the motion being granted as unopposed . . . ." (Doc. No. 32.)

Seiber filed a statement of undisputed material facts that complies with the requirements of Local Rule 56.01 and includes citations to deposition transcripts, exhibits, and other documents in the summary judgment record. (Doc. No. 31.) Hembrook has not responded to Seiber's statement of facts as required by Local Rule 56.01(c). The Court thus deems Seiber's asserted facts to be undisputed for summary judgment purposes. *See* M.D. Tenn. R. 56.01(f) (failure to respond).

However, establishing these facts as undisputed does not lessen Seiber's burden to show an absence of any genuine dispute of material fact under Federal Rule of Civil Procedure 56. *See Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991) ("[A] party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond."); *Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) ("[T]he fact that the movant's affidavits are uncontroverted does not necessarily mean that summary judgment should be granted[;] the ultimate burden of proving the propriety of summary judgment remains on the moving party."). Accordingly, even though Hembrook did not respond to Seiber's statement of undisputed material facts, the Court must still examine Seiber's evidence to determine if it is sufficient to satisfy his initial summary judgment burden. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) ("'[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)).

## B. Hembrook's § 1983 Claims

Section 1983 provides a civil enforcement mechanism against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the

Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Hembrook brings claims for false arrest and malicious prosecution, alleging that Seiber violated her rights under the Fourth Amendment by arresting her and causing the initiation of criminal proceedings without probable cause on September 27, 2019, and March 6, 2020. (Doc. No. 9.) Seiber does not dispute that he acted under color of state law when he arrested Hembrook. The question before the Court in resolving Seiber's motion for summary judgment is whether the facts in the record, viewed in the light most favorable to Hembrook, can support a reasonable jury finding that Seiber deprived Hembrook of her rights under the Fourth Amendment.

Seiber raises qualified immunity as an affirmative defense to Hembrook's claims. (Doc. No. 30.) "The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Thai*, 707 F.3d 675, 680 (6th Cir. 2013). The goal behind qualified immunity is to "'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Richko v. Wayne Cnty.*, 819 F.3d 907, 914 (6th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir.

2011) (citing *Pearson*, 555 U.S. at 232). Where a defendant invokes qualified immunity and carry his initial summary judgment burden, "the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley*, 707 F.3d at 681.

Even if the plaintiff can show a genuine question of material fact as to whether the defendant violated her constitutional rights, the defendant is still entitled to qualified immunity if those rights were not clearly established at the time of violation. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In other words, "' existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The precedent clearly establishing a right can be in the form of a case of 'controlling authority or a robust consensus of cases of persuasive authority.'" *Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)).

Hembrook's false arrest and malicious prosecution claims "both arise under the Fourth Amendment." *Weser v. Goodson*, 965 F.3d 507, 514 (6th Cir. 2020). "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). To prove a claim of malicious prosecution under the Fourth Amendment, a plaintiff must show that (1) "a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute[;]'" (2) "there was a lack of probable cause for the criminal prosecution[;]" (3) "'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty' . . . apart from

the initial seizure"; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." *Id.* at 308–09 (first, second, and third alterations in original) (citations omitted).

The Sixth Circuit has recognized that "[t]he 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest," and that courts must therefore "consider not only whether" probable cause existed to arrest the plaintiff, "but also whether probable cause existed to initiate the criminal proceeding against [her]." *Id.* at 308, 311–12. In this case, however, Hembrook's allegations against Seiber are directed only at his actions regarding her September 27, 2019, and March 6, 2020, arrests, and central to all of her claims is the allegation that Seiber made those arrests without probable cause. (Doc. No. 9.) Thus, all of Hembrook's false arrest and malicious prosecution claims against Seiber rise and fall based on whether there was probable cause for her arrests. (*Id.*); *see also Shearon v. Womack*, No. 3:15-cv-01061, 2017 WL 5126180, at *3 (M.D. Tenn. Nov. 3, 2017) (stating that "[a] finding that probable cause existed" for plaintiff's arrest would defeat false arrest and malicious prosecution claims against arresting officer "because if there was no probable cause to arrest there would be no probable cause for criminal prosecution").

The Sixth Circuit has defined probable cause as """"reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.""" *Sykes*, 625 F.3d at 306 (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005)). Probable cause for an arrest exists if "the 'facts and circumstances within [the arresting officer's] knowledge . . . were sufficient to warrant a prudent' person to conclude that an [arrestee] either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (first alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Courts must determine whether there was probable cause for an arrest "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th

Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). "[T]he initial probable cause determination must be founded on 'both the inculpatory *and* exculpatory evidence' known to the arresting officer." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). An officer "cannot simply turn a blind eye toward potentially exculpatory evidence . . . ." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). At the same time, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Rather, where the circumstances of an arrest are "susceptible of innocent explanation[,]" a court should ask "whether a reasonable officer could conclude—considering all of the surrounding circumstances, including the plausibility of the explanation itself—that there was a 'substantial chance of criminal activity.'" *Id.* (first quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002), and then quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

### 1. Whether Probable Cause Existed for Hembrook's September 27, 2019 Arrest

Seiber argues that he is entitled to qualified immunity from Hembrook's claims arising from her September 27, 2019 arrest because the record evidence shows that Seiber had probable cause to arrest her for felony possession of marijuana under Tennessee Code Annotated § 39-17-417. (Doc. No. 30.) That statute provides that:

(a) It is an offense for a defendant to knowingly:

(1) Manufacture a controlled substance;

(2) Deliver a controlled substance;

(3) Sell a controlled substance; or

(4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance.

Tenn. Code Ann. § 39-17-417(a)(1)–(4) (2019).[4] A violation of the statute involving between one-half ounce and ten pounds of marijuana is a Class E felony. *Id.* § 39-17-417(g)(1).

"Marijuana" is defined under Tennessee law as "all parts of the plant cannabis, whether growing or not; the seeds of the plant; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, including concentrates and oils, its seeds or resin[.]" *Id.* § 39-17-402(16)(A). "'Marijuana' [ ] does not include hemp," *id.* § 39-17-402(16)(C), which is defined as "the plant cannabis sativa L. and any part of that plant, . . . whether growing or not, with a delta-9 tetrahydrocannabinol (THC) concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis[,]" i*d.* § 43-27-101(3).

At least one other court in this circuit has found that the possibility that a substance could be legal hemp instead of illegal marijuana does not defeat a finding that the sight or smell of that substance provides probable cause to conduct a search. In *United States v. Vaughn*, 429 F. Supp. 3d 499 (E.D. Tenn. 2019), the court found probable cause for the issuance of a search warrant based in part on police officers' statements that they smelled the odor of marijuana emanating from an apartment. The defendants moved to suppress evidence obtained from that search, arguing in part that smell alone could not have provided probable cause to search the apartment because the odor "could have been hemp, which is legal under both Tennessee and federal law." *Id.* at 508. The court noted that probable cause to search "requires 'a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place[,]'" *id.* at 510 (quoting *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)), and found that the possibility

---

[4]       All citations to the Tennessee Code Annotated in this Report and Recommendation refer to the 2019 version, which was in effect at the time of Hembrook's arrests.

"that the smell could have been hemp does not change the fact that it also could be . . . marijuana. The officers' detection of a marijuana odor meant there was a fair probability that marijuana would be found within the apartment, which is sufficient for probable cause." *Id.*; *see also United States v. Garth*, No. 3:20-CR-43, 2021 WL 8442271, at *12–13 (E.D. Tenn. July 6, 2021) (applying *Vaughn*'s reasoning to find that an officer's detection of an odor he believed to be marijuana at the window of a car "meant there [wa]s a fair probability that the car contained marijuana"); *United States v. Hayes*, 2020 WL 4034309, at *20 (E.D. Tenn. Feb. 21, 2020) (applying *Vaughn* to find that the legalization of hemp does not "eliminate[ ] any probable cause gained from a trained and certified drug detection dog's alert").

Courts outside this circuit have also found that the possibility that a substance could be hemp does not undermine an officer's judgment that there is probable cause to believe the substance is marijuana. In *United States v. Bignon*, 813 F. App'x 34, 37 (2d Cir. 2020), police officers arrested the defendant for possession of marijuana after observing him smoke what they believed to be a marijuana cigarette "based on the color and nature of the smoke, the distinctive way in which [the defendant] was holding the cigarette, the odor of marijuana in the air, and" the fact that the defendant discarded the cigarette when he saw the officers. The Second Circuit affirmed the district court's finding that the arrest was supported by probable cause, noting that "the [d]istrict [c]ourt's probable-cause finding is not undermined by the fact that [the defendant] repeatedly told the arresting officers that he was smoking hemp, not marijuana[,]" and "police lab tests ultimately showed that [the] cigarette did not contain marijuana." *Id.* The court noted that, where "the facts and circumstances of the arrest provide a reasonable basis for believing that probable cause existed, 'an officer's failure to investigate an arrestee's protestations of innocence

generally does not vitiate probable cause.'" *Id.* (quoting *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006)).

It is undisputed that Hembrook had approximately nine pounds of cannabis plants in her vehicle when Seiber pulled her over on September 27, 2019. (Doc. Nos. 29-4–29-6, 31.) Watson and Seiber believed, based on their training and experience, that the plants looked and smelled like marijuana. (Doc. Nos. 29-4, 29-6, 31.) There is also no dispute that "it is impossible to visually distinguish whether a cannabis plant is either marijuana or hemp by looking at it—it has to be scientifically tested—and hemp and marijuana smell the same and are indistinguishable based upon smell alone." (Doc. No. 31, PageID# 369, ¶ 41.) These facts indicate that, based on the information available to him at the time of the arrest, Seiber had probable cause to believe that Hembrook was in possession of marijuana. *See Bignon*, 813 F. App'x at 37; *cf. Vaughn*, 429 F. Supp. 3d at 510.

Seiber has also identified other evidence showing that he had probable cause to arrest Hembrook for marijuana possession. When Hembrook told Seiber that the plants were hemp, not marijuana, Seiber gave her an opportunity to provide support for that explanation. (Doc. Nos. 29-4–29-6, 31.) Hembrook did not produce any lab tests or other documentation at that time showing that these plants were, in fact, hemp. (Doc. No. 29-4, 29-6, 31.) When Seiber asked Hembrook if she could provide documentation from the computer at her farm, she refused, telling him that "'there w[ould] be a shoot-out'" "'if [Seiber] [went] up there[.]'" (Doc. No. 29-4, PageID# 263; Doc. No. 31.) Instead of providing test results showing that the plants contained less than 0.3% THC, Hembrook produced a hemp movement permit, which Seiber and Watson reasonably believed had been altered and did not match her vehicle description or the amount of cannabis she was transporting. (Doc. Nos. 29-4, 29-6, 31.) Seiber testified that Hembrook's inconsistent

statements about where she was going and her production of what appeared to be an invalid hemp movement permit were relevant to his probable cause determination. (Doc. No. 29-4.) Watson testified that the altered hemp permit and his observation that Hembrook appeared to have driven past her stated destination were "red flag[s] for [him] as an officer investigating a stop[.]" (Doc. No. 29-6, PageID# 318.)

These undisputed facts and corroborating record evidence indicate that "the 'facts and circumstances within [Seiber's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent' person to conclude that" Hembrook possessed marijuana in violation of Tennessee Code Annotated § 39-17-417. *Torres-Ramos*, 536 F.3d at 555 (quoting *Beck*, 379 U.S. at 91). Although Hembrook told Seiber that the cannabis plants in her vehicle were hemp and laboratory tests ultimately confirmed that explanation (Doc. No. 31), it was plausible for Seiber to conclude based on the information available to him at the time of the arrest that the plants were marijuana. *See Bignon*, 813 F. App'x at 37; *cf. Vaughn*, 429 F. Supp. 3d at 510. Considering the record evidence in the light most favorable to Hembrook, there is no genuine dispute of material fact that Seiber had probable cause to arrest Hembrook on September 27, 2019. The Court should find that Seiber is entitled to qualified immunity from Hembrook's false arrest and malicious prosecution claims based on her September 27, 2019 arrest.

## 2.    Hembrook's March 6, 2020 Arrest

Seiber also argues that he had probable cause to arrest Hembrook on March 6, 2020, for disorderly conduct and evading arrest. (Doc. No. 30.) Tennessee law provides that a person unlawfully evades arrest if they "intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop" "while operating a

motor vehicle on any street, road, alley or highway . . . ." Tenn. Code Ann. § 39-16-603(b)(1).[5] The record evidence indicates that Seiber signaled for Hembrook to stop after observing her driving forty-seven miles per hour in a posted thirty-mile-per-hour zone without wearing her seatbelt. (Doc. Nos. 29-4, 31.) Hembrook continued driving past "several pull-offs" (Doc. No. 29-4, PageID# 271) before "speeding real fast" into the parking lot of Mag's Auto, jumping out of her car, and running into the garage (Doc. No. 29-7, PageID# 323; Doc. Nos. 29-4, 29-8, 31). Based on these facts, Seiber has carried his burden of demonstrating probable cause to conclude that Hembrook had "intentionally fle[d] or attempt[ed] to elude" him after he signaled "to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1); *see also Torres-Ramos*, 536 F.3d at 555.

"A person . . . violates" Tennessee's criminal prohibition on disorderly conduct "who makes unreasonable noise that prevents others from carrying on lawful activities." Tenn. Code Ann. § 39-17-305(b). Seiber has cited record evidence indicating that Hembrook ran into Mag's Auto and screamed at the top of her lungs for thirty to forty minutes. (Doc. Nos. 29-4, 29-5, 29-7, 29-8, 31.) Marsha and Jeremy Gould testified that this was "a big disruption for [their] business" (Doc. No. 29-7, PageID# 325), and "caus[ed] a huge scene" (Doc. No. 29-8, PageID# 330). Hembrook testified that a man came out of a house nearby and asked what was going on. (Doc. No. 29-5.) This evidence, viewed in the light most favorable to Hembrook, indicates that Hembrook made "unreasonable noise that prevent[ed]" the Goulds, their customers, and "others from carrying on lawful activities." *See State v. Pugh*, No. W2020-00084-CCA-R3-CD, 2020 WL

---

[5]      It is a defense to the crime of evading arrest that the attempted arrest was unlawful. Tenn. Code Ann. § 39-16-603(b)(2). Hembrook alleges in her amended complaint that Seiber "had no reasonable articulable suspicion" to pull her over and "initiated this stop to harass and intimidate" her. (Doc. No. 9, PageID# 117, ¶ 30.) Because Hembrook has not offered any evidence to support this unsworn allegation, she has not shown that there is a genuine issue of material fact to preclude summary judgment on this issue. *See Celotex Corp.* 477 U.S. at 324.

7252022, at *7 (Tenn. Crim. App. Dec. 9, 2020) (affirming disorderly conduct conviction where defendant's "'holler[ing] and scream[ing]'" "made unreasonable noise that prevented [a] school from carrying on its normal, daily activities") (alterations in original). Seiber has met his burden of demonstrating that he had probable cause to arrest Hembrook under Tennessee Code Annotated § 29-17-305.

Hembrook has not identified any "specific facts showing that there is a genuine issue for trial" as to the existence of probable cause for her March 6, 2020 arrest and subsequent criminal prosecution. *See Celotex Corp.*, 477 U.S. at 324. Therefore, Seiber is entitled to qualified immunity from Hembrook's false arrest and malicious prosecution claims arising from her March 6, 2020 arrest.[6] Because Seiber has shown that he is entitled to summary judgment on all of Hembrook's claims, the Court need not consider his arguments regarding the availability of punitive damages.

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Seiber's motion for summary judgment (Doc. No. 29) be GRANTED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

---

[6]   Seiber has not addressed whether there was probable cause to support Hembrook's March 6, 2020 arrest for resisting arrest under Tennessee Code Annotated § 39-16-602(a). However, Hembrook has not provided any argument that the motion for summary judgment should be denied on this ground. Because Seiber has shown that he had probable cause to arrest Hembrook for evading arrest and disorderly conduct, it is not necessary for the Court to determine whether there was probable cause to support the resisting arrest charge. *See Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) (holding that, when a person faces multiple criminal charges, probable cause for any one of the charges will defeat Fourth Amendment false arrest and malicious prosecution claims as to the related charges).

A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 26th day of August, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge